LESLIE O. MOORE, APPELLEE, v. PACIFIC MUTUAL LIFE INSURANCE COMPANY, APPELLANT.

FILED MARCH 29, 1935. No. 29214.

*Brogan, Ellick & Shoemaker,* for appellant.

*Kennedy, Holland & De Lacy, contra.*

Heard before Goss, C. J., Rose, Good, Eberly, Day, Paine and Carter, JJ.

Goss, C. J.

Defendant appeals from a judgment of $6,078.16 on two policies of insurance in which defendant agreed to pay plaintiff on each policy $250 a month, except for the first three months of any period of disability, for (a) disability resulting from bodily injury effected through accidental means, (b) disability resulting from sickness, (c) "disability, in both cases, to be such as will result in continuous, necessary and total loss of all business time," (d) "no indemnity is payable under this policy for the specified first part (three months) of any period of disability."

The two policies are identical in their terms and provisions and were issued in 1923, six months apart. Two suits were brought on each policy, covering two separate periods of time. Both for trial and appeal the four actions were consolidated.

Plaintiff's occupation was that of an undertaker, actively managing and directing funerals and all things incidental thereto. He alleges that on June 4, 1931, he became ill with influenza and la grippe; was confined to his bed during the month of June, and on July 7, 1931, while convalescing from his illness, fell and injured his right knee; that as a result of this injury he became afflicted with arthritis, affecting various parts of his body; that he later became afflicted with endocarditis, and that as a result he was unable to follow his occupation to such an extent that his disability resulted in continuous, necessary and total loss of all business time from June 4, 1931, to September 4, 1932. The verdicts, on which judgment was entered, appear to be computed on that basis. By answer defendant appropriately raises the issue that at no time did plaintiff suffer disability from accidental means, sick-

ness or otherwise resulting in continuous, necessary and total loss of business time for a period of three months.

The assignments of error may be grouped so as to be disposed of by the answers to two questions: Was there sufficient evidence to sustain the verdict? and was the jury erroneously instructed?

To recite the evidence at length is unnecessary. Before his illness in June, 1931, plaintiff was a very active man, evidently well physically. On May 29, 1931, he called a doctor who diagnosed his case as that of a grippe infection and ordered him to bed for two or three days. After that, though still sick, he was up and around parts of most days until June 7, 1931, when he struck his knee on a concrete step at his mortuary at 3210 Farnam street. The same doctor was called and bandaged the knee, applied heat and prescribed internal medicine to ease his pain. The doctor testified he saw the patient practically every day for months. About two weeks after the injury, the joint began to swell and to show signs of inflammation, the patient had a low-grade fever, that is, a temperature of 99 to 101, "and it became perfectly apparent that he had developed an arthritis on his injury."

Arthritis is defined by Webster as "inflammation of the joints." In this case it began in the right knee. The infection then present was lit up by the trauma occurring when plaintiff fell and struck his knee. Later it spread to other joints—mostly in the lower extremities. It developed in the right ankle, in his big toes, in the left ankle and left hip, in the lower vertebræ and to a slight extent in two or three of his fingers. This spreading of the infection followed the customary course. It did not occur all at once, but progressed from one joint to another as the infection first present in the knee was liberated and found haven in other places.

The joint affected by arthritis goes through an acute stage of swelling and inflammation, which is very painful, and, after this stage subsides, there has been some overgrowth of bone in the joint. If the "overgrowth of bone

has been sufficient and motion is not started and kept up actively, this overgrowth of bone will permanently lock the joint," his physician testified. In other words, ankylosis or obliteration of the joint space by fibrous or bony tissue will occur. Knowing this, his skilful physician, to bring about a recovery, recommended "plenty of rest every day, continuous heat (applied by an electric baker), as often as he could, applied to the joints, * * * attempt to get up on crutches, begin to move around and get some motion in those stiffened joints." "We advised him to try to get out in his car, and to get all the fresh air he could, and to get all the motion, within the limits of his pain, that it was possible for him to do. Furthermore, he was so depressed mentally that it was necessary that he have some diversion, or I don't know what would have happened to him."

Following this advice, he got around on crutches, managed to pull himself into a car and ride. Later he got so he could drive a car in a way by using his left foot on the clutch and brake. But he tired easily. Uusually he remained in bed that first summer until the middle of the day and would go out about two hours in the afternoon, going some place to occupy his mind, sometimes to his office, then to bed until dinner time, after which he would go to bed early. In September, 1931, he went to California, where his parents lived, and lay on the sands of the seashore and bathed in the salt water, absorbing the violet rays which are helpful in treating arthritis. He remained in California for a month or so and returned to Omaha. After Christmas he made a trip to Excelsior Springs on the doctor's orders to get the hot packs and mineral water. He remained there about three weeks. In March, 1932, he made another like trip to Excelsior Springs. Early in June he went to Idaho Springs and Manitou, in Colorado, on the doctor's orders, where he received at a sanitarium about the same treatment as at Excelsior Springs. He still wore metal supports on his spine, ankle and knee and used either his crutches or, on level places, a cane. He did

not cease to use a cane until months after he admits going back and taking charge of his business in September, 1932. While plaintiff frankly admits doing certain little things while at his place of business that were connected with its prosecution, he denies doing any substantial work connected therewith at any time within the period of his claimed disability.

Evidence was produced, in addition to his admitted acts, tending to show that he attended some funerals and participated in them, especially during the first three months of his alleged disability, but also at later periods, which, if accepted under the rules of law invoked by defendant, would prevent a cause of action accruing in favor of plaintiff. This evidence tended to prove that plaintiff, while at his downtown place of business, made engagements over the telephone with parties who desired service, showed caskets, took data for notices to be inserted in the newspapers, arranged for his business to secure a minister or music, signed checks, and did other things of a nature like those described; and that plaintiff attended several funerals in which he assisted in taking care of the bereaved and the friends who attended and that he performed other services that were really a part of the business. Plaintiff's evidence tended to show that he either attended these funerals in the capacity of a close friend of the deceased and did nothing relating to the business, or, if he did anything, it was so insubstantial as not to affect the contract of insurance. We do not deem it necessary to take the space to detail this evidence, but think it sufficient to say that it was a question for the jury to decide, under proper instructions, whether plaintiff made a case or whether this evidence introduced by defendant constituted a sufficient defense to the action. Whichever way the jury decided would necessarily call for affirmance here unless there was error in the instructions, or elsewhere. It was not erroneous to overrule defendant's motion to direct a verdict for defendant. There was evidence amply sufficient to submit to the jury and to sustain a verdict. We do not

think this case is ruled, as claimed by defendant, by *Coad v. Travelers Ins. Co.,* 61 Neb. 563, wherein the policy provided that it was for indemnity resulting from an accident that shall "wholly disable him from transacting any and every kind of business pertaining to his occupation." Coad was insured as a "capitalist," he received an injury to a finger, was not prevented a single day from attending his office as usual and could do and did do practically everything as before, except to write letters, of which he had few and was in the habit of dictating some of them.

The case is controlled rather by the principle of the rule in *Hamblin v. Equitable Life Assurance Society,* 124 Neb. 841, where the insurance contract provided indemnity for one disabled by bodily injury if the insured "will be permanently, continuously and wholly prevented thereby for life from pursuing any and all gainful occupations." Plaintiff, formerly a cook, was able to use a telephone and solicit orders for the sale of merchandise. The court announced the following rules:

"A contract of insurance should be given a reasonable construction so as to effectuate the purpose for which it was made. In cases of doubt, it is to be liberally construed in favor of the insured.

"Total disability, preventing the insured from pursuing a gainful occupation, exists when the injured party is unable to perform the substantial duties of a given occupation.

"One may be totally incapacitated to pursue a gainful occupation, although he may be able to perform some of the inconsequential duties appertaining thereto."

Defendant quotes in his brief, and argues that it was erroneous for the court to give the middle sentence of what we quote from the court's instruction No. 5:

"You are instructed that the above language quoted from the policy does not mean that the policyholder must be rendered absolutely and literally unable to perform any part of his occupation in order to recover under the policy. It is sufficient if plaintiff has proved to you by a

preponderance of the evidence that he was physically incapable, in the exercise of ordinary prudence, of performing any substantial part of the duties necessary to a practical prosecution of his business in substantially the customary and usual manner. The fact, if you find it to be a fact, that plaintiff may have been able, during some or all of the months in question, to perform some of the minor and incidental duties pertaining to his business, does not necessarily deprive him of the right to recover benefits under the policy."

We have copied what went before and what followed after the sentence criticized so that we may have a truer picture of what the jury would derive from the context rather than from the sentence standing alone. This makes it clear to the lay mind as well as to the legal that, if the insured were rendered incapable of performing the "substantial duties" of his occupation, he might recover. This is in line with *Hamblin v. Equitable Life Assurance Society, supra.*

In *Hetzel v. Pacific Mutual Life Ins. Co.*, 108 W. Va. 22, the policy provided a certain sum a month for "continuous, necessary and total loss of all business time" due to sickness. It was there held: "The insured is entitled to recover if such sickness renders him incapable of performing, in substantially his customary and usual manner, all the duties necessary to the practical prosecution of his * * * occupation, disregarding all trivial acts which are not material to the prosecution thereof, but which are merely incidental thereto." Substantially to the same effect is *Pacific Mutual Life Ins. Co. v. Branham,* 34 Ind. App. 243.

In *Pacific Mutual Life Ins. Co. v. McCrary,* 161 Tenn. 389, it was held: "Total disability within the meaning of the law of insurance does not require a state of absolute helplessness, but it is an inability to do the material acts necessary to the prosecution of insured's business or occupation (and substantially all the material acts) in (substantially) his usual and customary manner. One

may still be described as totally disabled, although he is able at intervals to perform certain acts in connection with the former occupation or calling that he pursued"—citing 14 R. C. L. 1315, sec. 491; 1 C. J. 462, and notes, 51 A. L. R. 1048; 41 A. L. R. 1376; 37 A. L. R. 151; 24 A. L. R. 203.

We think the instruction was not misleading nor erroneous.

Appellant claims that instructions numbered 6 and 8 are conflicting and that, one being a correct and the other an incorrect statement of the law, error resulted because the former could not cure the latter. Instruction No. 6 told the jury that if they found any witness had testified falsely they were at liberty to disregard his entire testimony unless corroborated. Appellant approves this rule. Instruction No. 8 was the conventional instruction given for a generation by judges all over the state. Appellant criticizes the last sentence only, which reads: "Yet you have no right to reject the testimony of any of the witnesses without good reason, and should not do so until you find it irreconcilable with other testimony you may find to be true."

Appellant says that this part of the eighth instruction tells the jury they must accept testimony they have found under the sixth instruction to be false because there may be no other testimony on the particular matter and therefore no testimony with which to compare it and decide it "irreconcilable." This is splitting hairs too fine for us to believe the parts could be seen by the jury. Besides, how could they decide that any witness had testified falsely except by comparison of his testimony with other facts testified to or by the implication of other testimony? In our opinion the error assigned is not tenable. The instruction complained of is held free from prejudicial error.

If a man so disabled as the evidence shows plaintiff to have been cannot be permitted to have a verdict by a jury sustained on such a policy as was here sold to

him, and on the evidence in support thereof, it would discredit this type of insurance. We have purposely confined our citations of authorities chiefly to those in which the defendant was defeated on substantially the same principle in various other jurisdictions. The judgment of the district court was right and it is

AFFIRMED.