LEONARD PICKETT

*v.*

J. H. MURPHY, Administrator.

(*Jackson,* April Term, 1961.)

Opinion filed May 5, 1961.

LLOYD TATUM, Henderson, for petitioner.

WILL TOM ABERNATHY, Selmer, for respondent.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

Certiorari was granted and arguments have been heard.

As a result of a collision of two trucks, Troy Dean Murphy, the driver of one of the trucks, was killed. A judgment of $6,000 was rendered against Leonard Pickett, the driver of the other truck. The Court of Appeals affirmed the judgment upholding the verdict, and Leonard Pickett complains thereof by this petition for certiorari. The Court of Appeals observed that "it is an exceedingly close case". Each litigant will be referred to in his respective trial court status.

In substance, there are two complaints, to wit: (1) No evidence to support the verdict. In this particular case, this necessitates a rather lengthy discussion of the evidence. And (2) error of the Court in receiving the verdict.

(1) Gene Redmon, (2) the deceased, Troy Dean Murphy, (3) the defendant, Leonard Pickett, and (4) his uncle, Troy Pickett, were each engaged at the time in question in hauling in trucks driven by them sand used in the construction of a highway around Jackson, Tennessee. The accident occurred in McNairy County at a point where the course of the highway is east and west. It occurred in a valley some 200 to 300 feet in length. This valley was about equal distance between a hill on the east and a hill on the west. The crests of the two hills were from 600 to 800 feet apart. This would make the east and west ends of the valley from 150 to 200 feet distant from the crest of the respective hills. The collision occurred about the center of this valley.

Immediately prior to the collision, the truck of Troy Pickett loaded with sand was traveling west towards Jackson on its right-hand side, the north side of this

highway. The truck driven by the defendant, Leonard Pickett, followed a short distance behind. It likewise was loaded. The truck driven by Redmon had delivered its load of sand and was returning empty over this highway in an easterly direction on its right-hand side of the highway, being the south side thereof. Following the empty truck of Redmon, and between 150 and 200 feet behind on the south side, was the empty truck of deceased, Murphy. It was being driven by him. It, too, was on the south side of that highway.

About the center of the valley, and just about opposite a mail box on the south side of the highway, there was a mule standing on the shoulder with its head faced across the highway. Apparently, its intention was to cross the road.

Since the whereabouts of this mule at the time of the collision is dealt with at some length in the testimony, it is well to examine that evidence at this point. The three truck drivers mentioned and a man named Weatherington testified about this. All agree that the mule was standing close to a mail box on the south shoulder of the highway as the four trucks converged on that point, and that the collision occurred at or near this mail box.

Weatherington was in a field from 50 to 100 yards north of the north side of the highway. He first testified that after the lead truck going east, being driven by Redmon, passed the mule that it, the mule crossed the road. He modified that statement by testifying that after the Redmon truck got by "the mule then started across the road" and "at about that time or shortly after it—there was a collision" in which the second truck (the truck of the deceased) driving east was involved. He did

not see the truck driving west (the defendant's truck). So it is, that the substance of Weatherington's testimony is that he saw the mule start across the highway behind the Troy Pickett truck and about then occurred the collision which he heard but did not see.

Redmon, the driver of the eastbound empty lead truck, testified that he saw the mule about the mail box "about ready to come into the road, his head was"; that he slowed down; that he was "going by the mule when the wreck happened—my front end had done passed him"; that he saw the defendant when he, the defendant, "was about nearly at the side of me, the mule was not plumb by, he was by the front end, he was done by the front end".

Troy Pickett, as it will be recalled, was driving west with his loaded truck and being followed by the loaded truck of the defendant. In considering the testimony of Troy Pickett keep in mind that the mule at the mail box was west of his approaching truck and east of the truck of Redmon approaching from the west. Troy Pickett testifies that he passed the mule a little east of Redmon's approaching truck; that when he passed Redmon, after passing the mule, he, Redmon, wasn't but "just a little bit west of the mule"; that when the collision occurred "right at the back of Redmon's truck" the mule "hollered and ran off". It was subsequently seen in the middle of the road near the brow of the western hill.

The defendant's (Leonard Pickett) loaded truck driving west was following that of Troy Pickett. Defendant's testimony is that as he and Redmon approached the mule from opposite directions each slowed down. The truck of the deceased likewise was approaching the mule behind

Redmon's truck; that "Redmon was right close to the mule, he was right at the mule as I passed him", and it was while he was passing Redmon that his truck and that of the deceased collided; that "the mule didn't cross in front of me without it was after I had the wreck"

The foregoing testimony viewed in the light most favorable to the plaintiff permits only the conclusion that the mule had no more than started across the highway from the south to the north when the collision occurred.

The only eyewitnesses to the collision were the three surviving truck drivers. It is to their testimony on that point that attention will now be directed.

Troy Pickett, lead truck driving west, testifies that as Redmon, driving east, began to slow down for the mule, the deceased, following Redmon, "come over the hill (the western hill) pretty fast—and I knowed he was going to have a job stopping"; that after his truck passed that of the deceased, (they were going in opposite directions) he watched the truck of the deceased "through my mirror and he tried to slow down and he couldn't I reckon, he just cut out to the left" toward the north". Leonard Pickett (the defendant) when deceased "cut out was passing Redmon"; that deceased "cut to go out and he hit—right at the back of Redmon's truck".

Gene Redmon, the leading truck driving east, it being followed by the truck of the deceased, testified that when he slowed down for the mule he looked back through his mirror and saw the deceased pull like he was going to pull around the truck of the witness; "to come around me on the left side"; that the truck of the defendant at the time he looked back "was nearly about the side of me". He repeats the statement that the deceased "pulled out

like he was going to pull around me" and at that time maybe was 10 or 15 feet behind the truck of the witness. The front of the truck of deceased then struck the rear of the truck of this witness, Redmon. Then occurred its collision with the truck of defendant.

The defendant's, Leonard Pickett, testimony is that he, driving west, (following the Troy Pickett truck) slowed down when he saw the mule; that Troy Murphy (the deceased) driving east approached and "ran down under next to Redmon (driving the lead truck going east) which me and Redmon was passing. I'd say we were just passing". Then he "whipped out and hit me—he was just about 10 foot or some where, he was real close" behind the Redmon truck while the defendant, Leonard Pickett, was "just fixing to pass" Redmon.

So it is that every eyewitness to the collision, being the three truck drivers, testified that about the time the truck of the deceased reached the rear of the Redmon truck, it, the truck of deceased, was pulled to its left into the path of defendant's truck. At this point it should be noted that the truck of the deceased struck the truck of Redmon, so Redmon testifies, immediately preceding the collision with defendant's truck.

The only permissible conclusion from the foregoing evidence is that the mule which had started to cross did not in fact ever reach the traveled portion of the highway on the south. Had it done so, it would necessarily have been crushed between the Redmon truck driving east and the truck of the deceased also driving east behind the Redmon truck. Across the rear of the Redmon truck was a streak of green paint. The truck of the deceased was painted green.

Left for consideration are the marks upon the highway appearing immediately after the collision. On the oral argument of this case it was stated by the attorney for the administrator that he was relying upon these marks in support of his contention that there is material evidence to support the verdict.

Commencing near the crest of the west hill, and running east to within 10 or 15 feet west of the point of impact, was a black mark made by the tread of the wheels of the truck of deceased. All of this mark was on the south side of the highway; that is, the right side traveling east. In connection with the consideration of these skid marks, it should be recalled that Troy Pickett testified that as Redmon's truck slowed down because of the presence of the mule on the shoulder of the highway, he, Troy Pickett, observed the deceased traveling east as he topped the brow of the west hill at such a speed that the reaction of Troy Pickett was that "I knowed he was going to have a job stopping".

Just beyond the point where this black mark ends there was a fresh scar or place dug in the hard surface of the highway. It commenced at a point probably one to two feet south of the center line of the highway, but extended in a northwesterly direction several feet into that side of the highway north of the center line; that is, that part of the highway which is the right side of one traveling west, to wit, the defendant.

The Court of Appeals rested its conclusion that there was some evidence to sustain the verdict of the jury solely upon the skid mark and this scar in the highway. That Court observed that while it might be concluded that this scar was made by either of the involved trucks, yet the

position of the scar, and the course which it ran, "leaves a reasonable inference that this scar on the highway was made by some part of the underpinning of the truck of defendant, in view of the fact that there is some positive proof in the record that his entire front axle and wheels were broken from the frame and were at a point east of where the gravel spilled on the highway and his truck stopped".

It could just as reasonably be inferred that the scar on the south side of the highway very near the center line was caused by the collision of the front of the truck of deceased with the rear of the truck of Redmon immediately prior to the collision between the truck of the defendant and that of the deceased. The necessary result is that the opinion of the Court of Appeals is based upon surmise or speculation.

This Court, in its very recent opinion of *McCollum v. Guest*, 207 Tenn. 651, 343 S.W.2d 359, 360, quoted with approval from a Nebraska opinion [*Anderson v. Interstate Transit Lines*, 128 Neb. 612, 262 N.W. 445] as follows:

"We are inclined to accept the views of the courts heretofore quoted as to the fact that mere position of the 'bus' and 'truck' after the accident, with the accompanying mark, as shown by the evidence, afford no just basis for a reasonable conclusion. In other words, these facts are insufficient to meet the burden of proof".

And further therein quoted from Blashfield this:

"It is almost impossible for one to calculate with any degree of precision the behavior of vehicles after a collision";

and from *American Tobacco Co. v. Zoller,* 6 Tenn.App. 390, 393, as follows:

"It is well known that cars sometimes take peculiar and unexpected courses after accidents."

The text of 20 American Jurisprudence, page 1034, is as follows:

"So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except where they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other."

The evidence in behalf of the plaintiff does not meet this test. To the contrary, on the authority of *McCollum v. Guest,* supra, as well as upon reason, it must be concluded that there is no more than a scintilla of evidence to support the verdict for the plaintiff. Therefore, the Trial Judge erred in not sustaining the defendant's motion for a directed verdict.

The foregoing result renders it unnecessary to consider the alleged error in receipt of the verdict.

The verdict of the jury and the judgment entered thereon will be set aside. Judgment will be entered in favor of the defendant and the suit of plaintiff dismissed with costs adjudged accordingly.